IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:95-CR-00751-UU

FILED BY _*PG*_ D.C.

AUG 2 5 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

UNITED STATES OF AMERICA,

*Release Plan Attached hereto*

VS.

MARVIN GRIFFIN

DEFENDANT'S RESPONSE TO COURT'S ORDER

{DKT # 176 }{WAIVING – IN GOOD FAITH AND FOR

GOOD CAUSE} LEAVE TO FILE A CONSOLDIATED MOTION

FOR COMPASSIONATE RELEASE AND RELEASE PLAN ATTACHED HERETO

**RESPONSE:**

On August 14th, 2020 the Defendant was summons to the institution's mailroom where he received and signed for -- the Eleventh Circuit's Order -- filed 08/10/2020 – remanding the district court's denial of his motion to reduce sentence, which the court construed as seeking relief under SECTION 404(B) of the First Step Act of 2018, Pub. L.No. 115-391, SECTION 404(b), 132 Stat. 5194, 5222 ("First Step Act".) Court's Oder at page 1&2.

Notably, the day upon which the Defendant received said order was on a Friday. However, August 17th, 2020 – Monday – during the evening mail call – in the Defendant's living quarters – the Defendant received this Honorable Court's ORDER – entered August 11th, 2020 acknowledging the developments or actions taken by the Eleventh Circuit and "vacating" its

previous ODERS DKT ENTRYS 159, 171, and 175 – "resolving Defendant's Release Motions, {...}"
Ct's Order at page 2 of 3, Paragraph 1, Lines 3&4.

In said action, t his Honorable Court {inter alia} gave the Defendant the option to seek leave
to file a consolidated motion for compassionate release in lieu of his release motions if he so
chooses. Id.

In response, the Defendant states, while he believes that prior to making the serious and
complex decisions underlying extraordinary and compelling circumstances ,it is important for
the court to have a full set of views, he also believe the record is sufficient to support his
release motions to reduce sentence pursuant to the First Step Act. That is due to the fact or to
the extent these proceedings vacated by the court include the defendant's attempt to seek
administrative remedy {**EXH. A**} and the supplemental authority he attempted to add {**XH. B**}
outlining the provisions and legal claims of 1B1.13(d) he's relying on. The catch all provision.

In addition, it should be noted the prison is currently on "modified operations" which makes it
extremely difficult for him to not only research the issues of relating to this matter but also
prepare an additional or consolidated motion for compassionate release without running afoul
of the institution's policy. It bares

noting the Defendant had to take a leave of absence from his detail and borrow another
inmates' work station, to prepare this response.

As such, due to the circumstances of the prison – that has up-ended normal operations at
the prison -- as a result of COVID-19- the Defendant in good faith and for good cause waive
leave to submit a consolidated motion for compassionate release in lieu of his release motions.

Respectfully submitted

Marvin Griffin 57836-004

i

MARVIN GRIFFIN 57156-004
#2700 Federal Prison Complex
Prison Camp
PO Box 5,000
Yazoo City, MS. 39194

CASE NO: 19-14377-AA

RE: CLERK OF COURT
500 Forsyth Street N.W.
Atlanta, Ga. 30303

Date April 5th, 2020

JUDICIAL NOTICE
PURSUANT TO 28(J)

Dear Clerk of Court,

Please take judicial notice of the recent actions taken against Prison officials regarding the Appellant attempt to exhaust the issue of his 3582(C)(1)(A) compassionate release request pursuant to the First Step Act. This matter is now pending before the Warden for a second time.

Respectfully submitted
[signature]

YAX1330.16B

Page 7

Attachment A

## Federal Correctional Complex, Yazoo City, Mississippi
### Request for Administrative Remedy
### Attempt at Informal Resolution

Inmate Name: _Griffin, Marvin_

Register No: _57836-004_                     Unit: _Go(F)_

### TO BE COMPLETED BY INMATE:

1.  Briefly state your complaint.  Include all details and facts which support your request and the date on which the complaint occurred. This [administrative remedy complaint is lodged against the Yazoo Prison Complex "Administrative Remedy Clerk" (et.al.,) for intentionally sabotaging the Complainant's First Amendment Right to seek administrative redress; and Case Manager Mr. Griffin -- a BOP Official -- for [inter alia] violation of BOP P.S. 3420.11 & 1210. 21-24 i.e., use of inappropriate behavior, -- when communicating with the Complainant -- unprofessionalism, and failure to adequately assist the Complainant with respect to an outdated response [BP-9] issued February 2, 2020 attempted to be delivered March 15, 2020. SEE REVERSE SIDE FOR MORE INFORMATION.

2.  What actions are you requesting to resolve your complaint?

    _updated response within appropriate time frame the response_

### TO BE COMPLETED BY STAFF:

3.  Indicate below the efforts made to resolve the matter.  Be specific, but brief.  Include names of staff contacted to attempt resolution. (Use back of this form if necessary.)

    _Case Manager Griffin was contacted in reference to your complaint. Mr. Griffin stated he attempted to issue you two Administrative Remedies. But you refused to accept them unless he writes a memo stating when you received the Administrative Remedies. You are requesting an updated rejection within (over_

_F. Henderson  3/20/20_                _____          _____ 3/__/2020_
Correctional Counselor/Date         Inmate Signature/Date             Unit Manager Review/Date

**NOTE:**   Attach any pertinent documentation related to the inmate's complaint.

| | BP-8 Issued To Inmate | BP-8 Returned To Counselor | BP-9 Issued To Inmate | BP-9 Returned to Counselor | BP-9 Delivered to Admin. Remedy Clerk |
|---|---|---|---|---|---|
| Date: | 3-11-20 | 3/18/20 | | | |
| Counselor: | for F.Dr | Henderson | | | |

CONTINUATION FROM PREVIOUS PAGE:

    Accordingly, the Complainant or this administrative remedy complaint -- maintains BOP officials --acting in concert -- [actions] has made the administrative remedy program [PLRA] -- as will be shown below -- unavailable to the Complainant which has resulted in the exhaustion of that remedy wholly futile.

    Case in point, in January of 2020 the Complainant -- attempting to comply with the First Step Act -- filed two administrative remedy [BP-9's] -- requesting the Warden of Yazoo Low grant him relief under the First Step Act due to his post/conviction rehabilitative efforts. In those actions the Complainant explained that the matter was currently pending before the Court.

    Notwithstanding this admission, March 15th, 2020 [ a Sunday] at approximately 9:30 am the Complainant, along with several other inmates, was summonsed to report to the administration building. Upon arriving he was givens two administrative receipt rejections [supra] with a date post mark February 2, 2020, by Case Manager Mr. Griffin. A close observation of the documents revealed the Complainant had 5 days in which to resubmit both BP-9's, with corrections as specified in the rejections.

The Complainant attempted to to explain to Mr. Griffin that he needed a MEMO stating he'd received the Warden's rejections March 15th, 2020 rather than February 2nd, 2020, at which time said BOP officials belligerently replied: "I'M NOT GIVING YOU ANYTHING!"

    The Complainant then attempted to explain said BOP official that he could not in "good faith" accept the rejections without a MEMO at which time said BOP Offical stated: "I DON'T CARE IF YOU REJECT THEM OR NOT '

The Complainant was ultimately     left with no other choice -- due to said BOP official's inappropriate and disrespectful demur -- but to reject receiving both outdated Warden responses; and chose to pursue this action -- as a matter of right and to build the record -- to demonstrate to the court the lack of respect BOP officials have and show inmates often experience when seeking relief under the administrative remedy program.

_Staff Response Continue:_

the appropriate time frame. Your request for an updated rejection can not be granted at this level.

I trust this information will be helpful in addressing your complaint.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>vs.<br><br>KEPA MAUMAU,<br><br>          Defendant. | ORDER AND MEMORANDUM DECISION<br>SETTING HEARING ON<br>MOTION TO REDUCE SENTENCE<br><br><br>Case No. 2:08-cr-00758-TC-11 |

On January 5, 2012. Defendant Kepa Maumau was sentenced to 57 years in prison. (ECF No. 1269.) The sentence was later reduced to 55 years following an appeal. (ECF No. 1538.) Now, after having served approximately ten years in prison,[1] Mr. Maumau has filed a motion to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A). (ECF No. 1735.)

To obtain a sentence modification, Mr. Maumau must first show that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). If he successfully makes this showing, the court must then weigh the factors typically considered at the time of sentencing—the nature of the crime, the defendant's characteristics and history, the danger to the public, the sentencing range available, and other relevant issues—to determine what type of modification is appropriate. 18 U.S.C. § 3553(a).[2]

---

[1] Mr. Maumau was in custody throughout the proceeding. (ECF No. 142.)

[2] This provision is often referred to as a the "compassionate release" statute. See United States v. Beck, No. 1:13-CR-186-6, 2019 WL 2716505 at *4 (M.D.N.C. June 28, 2019). In this order, the court uses the phrase "compassionate release" and "sentence modification" interchangeably, which is consistent with how other courts have used the terms.

Mr. Maumau's motion raises three questions. First, does the court have the discretion to provide relief? For the reasons stated below, the court concludes that it does. Second, should the court exercise that discretion to modify Mr. Maumau's sentence? Again, the court concludes below that it should. Finally, if Mr. Maumau is a good candidate for relief, by how much should his sentence be reduced? To resolve this question, the court orders the United States and Mr. Maumau to appear at a hearing on April 7th, at which time the court will weigh the § 3553(a) factors and make its determination.

## I. Whether the Court has Discretion to Provide Relief

A term of imprisonment can be reduced only if "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Congress has tasked the United States Sentencing Commission with defining the phrase "extraordinary and compelling" and has also required that any judicial order modifying a sentence be "consistent with applicable policy statements issued by the Sentencing Commission." See 28 U.S.C. § 994(t); 18 U.S.C. § 3582(c)(1)(A).

~~The parties agree that under the existing Sentencing Commission policy, Mr. Maumau is not entitled to a compassionate release. But this policy has not been updated to reflect the passage of the First Step Act of 2018.³ See Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018). Mr. Maumau contends that the First Step Act empowers the court to provide relief, notwithstanding that policy.~~

---

³ The Sentencing Commission's policies are unlikely to be updated any time soon because there are currently an insufficient number of appointed commissioners. See United States v. Brown, No. 4:05-CR-00227-1, 2019 WL 4942051 at *2 n.1 (S.D. Iowa Oct. 8, 2019) ("As district courts have noted often this year, the Sentencing Commission has not amended the Guidelines following the First Step Act and cannot do so until it again has four voting commissioners."); see also About the Commissioners, U.S. SENTENCING COMM'N, https://www.ussc.gov/commissioners (last visited Feb. 12, 2020) (stating that only two commissioners are presently in place).

"Before passage of the First Step Act of 2018, district courts could grant compassionate release sentence reductions only upon a motion by the [Bureau of Prisons] Director." United States v. Beck, No. 1:13-CR-186-6, 2019 WL 2716505 at *4 (M.D.N.C. June 28, 2019). After the First Step Act, a motion for modification may be brought directly by the prisoner.[4] 18 U.S.C. § 3582(c)(1)(A).

The Sentencing Commission's current policy still states that a court can order a compassionate release only "[u]pon motion of the Director of the Bureau of Prisons." See U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2004). It then outlines four situations in which a compassionate release is appropriate. Id. at n.1(A)-(D). The first category covers prisoners with terminal medical conditions, the second addresses prisoners of advanced age, and the third applies when a prisoner becomes the sole available caregiver for a child, due to the death or incapacitation of the other parent. Id. at n.1(A)-(C). Mr. Maumau does not seek relief under any of these subdivisions.

The final category is a catch-all provision that permits relief when, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." Id. at n.1(D). It is under this catch-all provision that Mr. Maumau seeks relief.

The Director has never recommended that Mr. Maumau receive a sentence modification. But Mr. Maumau argues that because the First Step Act now allows either the Director or the individual defendant to file a motion for compassionate release, the portion of the catch-all provision that limits relief to grounds identified by the Director is inconsistent with the law.

---

[4] Such a motion may be brought only after the prisoner has exhausted certain avenues of administrative relief. The United States concedes that Mr. Maumau satisfied these requirements before filing his motion. (See Pl.'s Opp'n at 9-10 (ECF No. 1740).)

At present, no Court of Appeal has addressed this issue. But a majority of district courts to consider the question have embraced Mr. Maumau's position:

> There is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act. By its terms, the old policy statement applies to motions for compassionate release filed by the BoP Director and makes no mention of motions filed by defendants. . . .
>
> While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether "extraordinary and compelling reasons" warrant a sentence reduction under § 3582(c)(1)(A)(i). (An interpretation of the old policy statement as binding on the new compassionate release procedure is likely inconsistent with the Commission's statutory role. . . . It is also inconsistent with the First Step Act, which was enacted to further increase the use of compassionate release and which explicitly allows courts to grant such motions even when BoP finds they are not appropriate. . . .) Thus, courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement.

Beck, 2019 WL 2716505 at *5-6; see also United States v. Cantu, No. 1:05-CR-458-1, 2019 WL 2498923 at *5 (S.D. Tex. June 17, 2019) ("[T]he correct interpretation of § 3582(c)(1)(A)— based on the text, statutory history and structure, and consideration of Congress's ability to override any of the Commission's policy statements at any time . . . —is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) warrant granting relief."). Accord United States v. Cantu-Rivera, No. H-89-204, 2019 WL 2578272 at *2 n.1 (S.D. Tex. June 24, 2019); United States v. Fox, No. 2:14-cr-03-DBH, 2019 WL 3046086 at *3 (D. Me. July 11, 2019); United States v. Rivernider, No. 3:10-cr-222(RNC), 2019 WL 3816671 at *2 (D. Conn. Aug. 14, 2019); United States v. Bucci, No. 04-10194-WGY, 2019 WL 5075964 at *1 (D. Mass. Sept. 16, 2019); United States v. Brown, No. 4:05-CR-00227-1, 2019 WL 4942051 at *4 (S.D. Iowa Oct. 8, 2019); United States v. Urkevich, No. 8:03CR37, 2019 WL 6037391 at *3 (D. Neb. Nov. 14, 2019); United States v.

Dusenbery, No. 5:91-cr-291, 2019 WL 6111418 at *3 n.3 (N.D. Ohio Nov. 18, 2019); United

States v. Valdez, No. 3:98-cr-0133-01-HRH, 2019 WL 7373023 at *2-3 (D. Alaska Dec. 31,

2019); United States v. Schmitt, No. CR12-4076-LTS, 2020 WL 96904 at *3 (N.D. Iowa Jan. 8,

2020).

 The United States urges this court to disregard these cases, and to instead follow the

minority of courts that have held that the Sentencing Commission's policy remains binding.

 Of the cases cited by the United States, several are irrelevant because they address

compassionate release requests that were based on subdivisions A through C of the Sentencing

Commission's policy—for medical condition, age, or caregiver status—~~but did not discuss the~~

~~such an provision in subdivision D, which is at issue here.   See United States v. Willis, 382 F.~~

~~Supp. 3d 1185 (D.N.M. 2019); United States v. McGraw, No. 2:02-cr-00018, 2019 WL 2059488~~

~~(S.D. Ind. May 9, 2019); United States v. York, No. 3:11-CR-76, 2019 WL 3241166 (E.D. Tenn.~~

~~July 18, 2019); United States v. Washington, No. 5:13-020-DCR, 2019 WL 6220984 (E.D. Ky.~~

~~Nov. 21, 2019).~~ But the policy's first three categories are substantively different from the fourth

category.  Nothing in the First Step Act necessarily requires the Sentencing Commission to

reevaluate those first three subdivisions.  It is likely that a hypothetical post-First Step Act policy

promulgated by the Sentencing Commission would be substantively the same for those

categories.  The ~~fourth category, by contrast, allocates significant discretion to the Director of the~~

~~Bureau of Prisons, which was consistent with pre-First Step Act law but is no longer appropriate,~~

~~given Congress's decision to remove the Director's control over compassionate release motions.~~

In short, it is dicta for those courts to hold that the entire policy remains valid because the

continued validity of subdivision D was not before any of those courts.

The United States also cites three other cases that do specifically address the catch-all provision. One of these, United States v. Shields, No. 12-cr-00410-BLF-1, 2019 WL 2359231 (N.D. Cal. June 4, 2019), is of little help. The Shields court concluded that the catch-all provision was still binding because "[the defendant] has not cited, and the Court has not discovered, any authority for the proposition that the Court may disregard guidance provided by the Sentencing Commission where it appears that such guidance has not kept pace with statutory amendments." Id. at *4. ~~It is unsurprising that the Shields court found no authority on this issue, as it was the first court (by about eleven days) to directly consider the continued legitimacy of the catch-all provision.~~ It is unknown how the Shields court would rule if presented with the issue today, now that it would have the benefit of the eleven opinions from other district courts, cited above, which all hold that the catch-all provision must be disregarded in light of the First Step Act.

The other two cases cited by the United States are also unpersuasive. First, in United States v. Willingham, No. CR113-010, 2019 WL 6733028 (S.D. Ga. Dec. 10, 2019), the court quoted other cases that involved the continued validity of the medical release portion of the policy and then summarily extrapolated that the catch-all provision must also still be valid. Id. at *2 (citing United States v. Johns, No. CR 91-392-TUC-CKJ, 2019 WL 2646663 (D. Ariz. June 28, 2019), United States v. Gross, No. 2:04-CR-32-RMP, 2019 WL 2437463 (E.D. Wash. June 11, 2019), and United States v. Heromin, No. 8:11-cr-550-T-33SPF, 2019 WL 2411311 (M.D. Fla. June 7, 2019)). ~~But as just discussed, under the First Step Act, there are legitimate reasons to treat the portion of the policy dealing with medical release differently from catch-all subdivision.~~

Meanwhile, in <u>United States v. Lynn</u>, No. 89-0072-WS, 2019 WL 3805349 (S.D. Ala.

Oct. 8, 2019), the court held that so long as the statute continued to instruct the Sentencing

Commission to define what counted as an extraordinary and compelling reason to provide relief,

the Sentencing Commission's most recent policy continued to govern.  The court held that "[i]f

the policy statement needs tweaking . . . , that tweaking must be accomplished by the

Commission, not by the courts."  <u>Id.</u> at *4.

This court respectfully disagrees.  As discussed at length in <u>Brown</u>, which was directly

responding to the <u>Lynn</u> decision, one of the express purposes of the First Step Act was to

"increas[e] the use and transparency of compassionate release."  <u>Brown</u>, 2019 WL 4942051 at

*3.  But continuing to give the Bureau of Prisons Director a veto over such requests would defeat

this goal.  Instead, "the only way [that] direct motions to district courts would increase the use of

compassionate release is to allow district judges to consider the vast variety of circumstances that

may constitute 'extraordinary and compelling.'"  <u>Id.</u>; <u>see also</u> <u>Beck</u>, 2019 WL 2716505 at *6

("An interpretation of the old policy statement as binding on the new compassionate release

procedure is . . . inconsistent with the First Step Act, which was enacted to further increase the

use of compassionate release and which explicitly allows courts to grant such motions even when

BoP finds they are not appropriate.").

Having reviewed all of the above cases, this court joins the majority of other district

courts that have addressed this issue in concluding that it has the discretion to provide Mr.

Maumau with relief, even if his situation does not directly fall within the Sentencing

Commission's current policy statement.  Under the First Step Act, it is for the court, not the

Director of the Bureau of Prisons, to determine whether there is an "extraordinary and compelling reason" to reduce a sentence.[5]

## II.      Whether Mr. Maumau is Entitled to Relief

Even though the court has the discretion to provide relief, Mr. Maumau must still demonstrate that there is an "extraordinary and compelling reason" to reduce his sentence. Mr. Maumau argues his sentence should be reduced primarily because of his age at the time of conviction, the length of sentence imposed, and the fact that Congress has subsequently reduced the sentencing guidelines that apply to the same crimes.

Mr. Maumau was 20 years old when he was arrested and was 24 years old when he was sentenced. (Def.'s Mot. at 1 (ECF No. 1735).) He was sentenced to seven years in prison for one violation of 18 U.S.C. § 924(c),[6] twenty-five years for the second violation of § 924(c), and twenty-five years for the third violation of § 924(c), all to be served consecutively, as required by the mandatory minimum sentences in place in 2012.[7] (Id. at 3.)

This court has repeatedly expressed its concern regarding the length of that sentence. At the sentencing hearing, Mr. Maumau's attorney made a lengthy statement regarding the

---

[5] The court briefly notes that, in reaching this conclusion, its reasoning is slightly different from some of the other district courts cited above. A few of those cases frame the First Step Act as shifting discretion from the Bureau of Prisons Director to the district courts. See, e.g., Fox, 2019 WL 3046086 at *3 ("I treat the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts."); Brown, 2019 WL 4942051 at *4 (same). But in this court's view, the district courts have always had the discretion to determine what counts as compelling and extraordinary. The courts have never been a rubber stamp for compassionate release decisions made by the Bureau of Prisons. See, e.g., United States v. DiMasi, 215 F. Supp. 3d 179 (D. Mass. 2016) (ordering the Bureau of Prisons Director to file more evidence to justify its conclusion that a prisoner should obtain relief). The key change made by the First Step Act is not a redistribution of discretion, but the removal of the Director's role as a gatekeeper. Before the First Step Act, the Director's role limited the number of cases the courts saw and, by extension, limited the number of instances in which the courts exercised their discretion to determine what counted as an extraordinary and compelling reason to modify a sentence. Because prisoners may now file motions directly, courts will address this issue more frequently. But this is not a new grant of discretion; it is merely an increased opportunity to exercise that discretion.

[6] Section 924(c) imposes a sentencing enhancement for "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm."

[7] As noted above, his seven-year sentence was subsequently reduced to five years, in light of the Supreme Court's decision in Alleyne v. United States, 570 U.S. 99 (2013). (ECF No. 1538.)

unjustness of the mandatory sentence, to which the court responded, "I think what's been said is accurate." (Sentencing Transcript 6:10-10:8 (ECF No. 1391).)[8]  Later, in early 2019, the court submitted a letter to U.S. Attorney John Huber, writing, "At the time of sentencing, I noted my distaste with the mandatory sentence I was required to impose on Mr. Maumau.  Now I have another opportunity to express my dissent. . . .  I urge you to do everything in your discretionary prosecutorial power to correct this injustice."  (Ex. A to Def.'s Mot. (ECF No. 1735-1).)

As part of the First Step Act, Congress eliminated the consecutive stacking previously required for violations of § 924(c):

> [Before the First Step Act], one § 924(c) count carried a five-year minimum sentence that must be served consecutively.  An additional § 924(c) count required the district court to tack on another twenty-five years in prison, even though that gun possession occurred during the same course of conduct as the original count. . . .
>
> The [First Step Act] clarified that § 924(c) counts can only be stacked if the second offense occurs after a final conviction on the first offense.  § 403(a), 132 Stat. at 5221-22.  In other words, if sentenced today, a court would add only five years to [a defendant's] sentence . . . , not thirty.

Brown, 2019 WL 4942051 at *5.

When considered together, the court is inclined to find that Mr. Maumau's age, the length of sentence imposed, and the fact that he would not receive the same sentence if the crime occurred today all represent extraordinary and compelling grounds to reduce his sentence.

The United States points out in its opposition that Mr. Maumau's request is unlike the vast majority of compassionate release requests because he is not suffering from any medical- or

---

[8] The fact that the court had this concern at the time of sentencing has no bearing on whether it may now be grounds for a compassionate release.  As the Sentencing Commission has noted, "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment. Therefore, the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement." U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.2.

age-related physical limitations.  But the fact that such cases are uncommon does not mean that Mr. Maumau's request must be denied.

First, the lack of such cases is, at least arguably, part of what spurred Congress to pass the First Step Act.  The Bureau of Prisons Director was first placed in charge of bringing compassionate release motions as part of the Sentencing Reform Act of 1984.  See Pub. L. No. 98-473, 98 Stat. 1837 (Oct. 12, 1984).  In the Senate Report that accompanied that Act—which both Mr. Maumau and the United States cite in their briefing—Congress indicated that sentence modifications would be appropriate in "cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term of imprisonment." S. Rep. No. 98-225, at 55-56 (1984).  Despite this intent, a 2013 Inspector General's report by the Department of Justice found that "although the BOP's regulations and Program Statement permit non-medical circumstances to be considered as a basis for compassionate release, the BOP routinely rejects such requests and did not approve a single nonmedical request during the 6-year period of our review." U.S. DEP'T OF JUSTICE, The Federal Bureau of Prisons' Compassionate Release Program, at ii, (Apr. 2013).[9]

In other words, Congress indicated thirty-five years ago that it would be appropriate to provide compassionate releases when sentences are "unusually long" but the Bureau of Prisons consistently declined to seek relief in those situations.  Congress responded by eliminating the Bureau of Prisons' gatekeeping function over compassionate releases.  Accordingly, the fact that

---

[9] Available at https://oig.justice.gov/reports/2013/e1306.pdf.

the phrase "extraordinary and compelling reason" has not historically been interpreted to include exceedingly long sentences is an unpersuasive reason to exclude such an interpretation today.

In any event, ~~United States is incorrect in suggesting that courts have never provided compassionate releases due to lengthy sentences~~. In <u>Brown</u>, for example, the court strongly implied that changes to how § 924(c) sentences are calculated could be an extraordinary and compelling reason to modify a sentence. <u>Brown</u>, 2019 WL 4942051 at *5. The court denied relief in that case only because it concluded that the defendant ought to serve more of his original sentence before the court would consider making that finding. <u>Id.</u> at *6 ("[B]ecause Defendant would still be in prison under modern law, any sentencing disparity created by § 924(c) stacking does not, <u>at least yet</u>, provide an 'extraordinary and compelling reason' for compassionate release.") (emphasis added).

The <u>Cantu-Rivera</u> court also took the length of the sentence into account when it provided relief:

> Mr. Cantu-Rivera also meets the requirements of U.S.S.G. § 1B1.13, comment. (n.1(D)), which permits a reduction when "there exists in defendant's case an extraordinary and compelling reason other than, or in combination with," the remainder of the Guideline definition. Such a combination of factors is present in this case. First, the Court notes the age-related factors previously discussed. The Court also recognizes the extraordinary degree of rehabilitation Mr. Cantu-Rivera has accomplished during the 30 years he has been incarcerated. . . . Finally, the Court recognizes as a factor in this combination the fundamental change to ~~sentencing policy carried out in the First Step Act's elimination of life imprisonment~~ ~~sentences that were formerly required solely by reason of a defendant's prior convictions~~. . . . The combination of all of these factors establishes the extraordinary and compelling reasons justifying the reduction in sentence in this case.

<u>Cantu-Rivera</u>, 2019 WL 2578272 at *2.

~~Finally, and perhaps most importantly, a prior court has reduced a defendant's sentence based solely on the First Step Act's changes to § 924(c) sentencing:~~

The Government acknowledges that Urkevich's three firearms counts would have carried mandatory terms of 60 months each (180 months), and not 300 months for Counts III and V (660 months total) if he had been sentenced after the effective date of the First Step Act. Accordingly, the sentence he is serving (848 months) is forty years longer than the sentence he likely would have received (368 months) if he were sentenced under the law (18 U.S.C. § 924(c)(1)(C)) as it now exists.

. . .

~~reduction in his~~ sentence is warranted by extraordinary and compelling reasons, ~~specifically the injustice of facing a term of incarceration forty years longer than~~ ~~Congress now deems warranted for the crimes committed.~~

Urkevich, 2019 WL 6037391 at *2-4.

Like the Urkevich court, this court concludes that the changes in how § 924(c) sentences are calculated is a compelling and extraordinary reason to provide relief on the facts present here.

~~The United States objects to this conclusion because it argues that Congress could have made~~ ~~its changes to § 924(c) retroactive but it chose not to do so.~~ See Brown, 2019 WL 4942051 at *5. While this is a relevant consideration, it ultimately has little bearing on the court's conclusion. ~~It is not unreasonable for Congress to conclude that not~~ all ~~defendants convicted~~ ~~under § 924(c) should receive new sentences, even while expanding the power of the courts to~~ ~~relieve~~ some ~~defendants of those sentences on a case-by-case basis.~~ As just noted, that is precisely the approach taken by the Urkevich court.

Based on the above, the court concludes that a combination of factors—Mr. Maumau's young age at the time of the sentence, the incredible length of the mandatory sentence imposed, and the fact that, if sentenced today, he would not be subject to such a long term of imprisonment—establish an extraordinary and compelling reason to reduce Mr. Maumau's sentence.

### III.    The Type of Modification is Warranted Here

Having found that Mr. Maumau's sentence should be reduced, the court must next "consider[] the factors set forth in section 3553(a) to the extent they are applicable" to determine what type of new sentence would be appropriate.

Those factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

(5) any pertinent policy statement . . . issued by the Sentencing Commission . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The court notes that, notwithstanding the colloquial references to Mr. Maumau's motion as one for "compassionate release," the court need not actually modify the sentence to effectuate Mr. Maumau's immediate release from prison.  Rather, a downward adjustment may be made

even if it results in Mr. Maumau's continued incarceration. See Urkevich, 2019 WL 6037391 at

*4 ("If this Court reduces Urkevich's sentences on Counts III and V to 60 months each,

consecutive, he will not be eligible for immediate release. His sentence would total 368 months,

and he would have served somewhat more than half that sentence. Nonetheless, the Court does

not consider the Motion premature. . . . A reduction in the sentence at this juncture will help

Urkevich and the Bureau of Prisons plan for his ultimate release[.]").

Regarding what type of sentence to impose, Mr. Maumau "urge[s] the Court to . . . hav[e]

him brought to the district, where he can be interviewed by Probation and perhaps have an

opportunity to address the Court." (Def.'s Reply at 1 (ECF No. 1744).) The court agrees that

this is the best way for the court to determine an appropriate sentence modification.

Accordingly, the court sets this matter (ECF No. 1735) for a hearing at 2:00 p.m. on April

7th. At that time, Mr. Maumau and the United States will be permitted to present their

arguments regarding what would be an appropriate sentence for Mr. Maumau in light of the

above factors. The court further orders Mr. Maumau, in advance of the resentencing hearing, to

meet with the Probation Office, and for the Probation Office to prepare a new Presentence

Report that addresses Mr. Maumau's character, his danger to the public, his likelihood of

rehabilitation or recidivism, the type of sentence he likely would have received had he been

charged and convicted after the First Step Act had been passed, and any other relevant

considerations.

The U.S. Attorney's Office is ordered to immediately arrange for Mr. Maumau's

transportation to Utah so that he may meet with the Probation Office and be present at the

hearing.

SO ORDERED this 18th day of February, 2020.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge

*EXH - C*

                                                    BUSINESS PLAN &
                                            MARKETING/ PROMO PLATFORM


RE: NIVRAMSBOOKSHELF @ 360 DEGREES
    7525 NW 11th AVENUE
    Miami, Florida 33150
    Website ("The Shelf") Under Construction
    Email: **nivramsbookclub@gmail.com**
    **EIN #:**


     Nivramsbookshelf @ 360 DEGREES, aka " The Shelf " is an up and coming
independent book publishing firm based in the bowels of Miami and Boynton Beach
Florida. The Firm was founded by renown author Marvin Griffin aka Robbyn Marvyn
in 2008 with idea of self publishing several books he'd written while spending
decades in federal prison. Notably, The Shelf has been in good standards with
the Department of Corporations in Tallahassee Florida for over ten years, with
expectation to launch once R/Marvyn is released.
     To date. R/Marvyn has amassed himself with a ridiculous work ethic which
consist of approximately 26 titles that include but is not limited to a
biography, motivational and health manual. [**SEE ATTACHMENT ONE**] His work ethic
also consist of a dynamic Blood On My Hands/ Ghetto Tale 17 Book Series, told
from imaginary and surrealism prose, about the gritty streets of Miami. My name
is            and I'm the President of Nivramsbookshelf, my name is
            and I'm in charge of treasury, and my name is
and I'm the secretary; and together we're seeking start up funds in the  sum
certain amount of $500,000.00 (FIVE HUNDRED THOUSAND DOLLARS AND ZERO CENTS) in
start up funds to get The Shelf off the ground. We note that while $500,000.00
may  sound like a lot of money, "The Shelf" is confident, by its plan below,
that it will make good on your investment decision as it foster innovation in
the competitive entertainment industry. And here's how!

     One of " The Shelf's " goal/mission is to become a number one book source
for Miami readers looking for heart wrenching, engrossing and mainstream or
urban stories with compelling story lines and character-drive plots filled with
all the street drama (i.e., raunchy sex scenes, lies, betrayal and murder) that
readers love and can relate to. However, our staff at "The Shelf" understand not
only that no two stories are told alike but also the fact that to accomplish our
goal it's going to take more than just a drive to produce stellar work, but a
strong promotional and

marketing plan. Mind you every book was written with this in mind. Which is why " The Shelf" is breaking into the industry not only with a motivated author with a passion for writing but also a gorilla marketing platform--tailored around selling hundreds of thousands of books-- in the first three quarters. In addition, NIVRAMSBOOKSHELF stories will be backed up with quality books and an exceptional customer service department that will always treat its customers with the utmost dignity and respect.

## FIRST STEP

Like any astute business man or woman with an entrepreneur spirit, our first step is to get "The Shelf" off the ground and up and running. This would require several key factors which include but is not limited to sufficient financial backing. Next, building an exclusive company--easy to navigate-- website that will envision "The Shelf's" short and long term goals is essential. On this site readers will also find attractive features -- like an author bio -- that will acquaint them with the author and his journey towards redemption while they contemplate buying a book(s). Needless, to say other factors pivotal to getting the company up and running include but is not limited to purchasing 20 ISBN #'s, 20 barcodes, 11 cover designs, editing and copy right expenses, public relations (PR) agent, social media manager--with an expertise to manage an effective social media campaign; targeted advertisement, computers, at least two company promotional vehicles, and a team of foot soldiers ready to hit the streets the moment the ribbon is cut. SEE EXPENSE SHEET @ PAGE  FOR ADDITIONAL COSTS AND EXPENSES DIRECTIVES.

## STEP TWO
## PROMOTIONAL STRATEGY

Once the company is set up, the next step will be to immediately begin to explore the promotional strategy spoken of earlier that would --by the way -- incorporate teaser ads announcing launch of wibsite. Ideally, this promo strategy will consist of an aggressive gorilla/marketing platform-- taken right out of New York Times Best Selling Author L. Conrad's book Gorilla Marketing. L. Conrad--an expert in the field of promotion and marketing -- stated " The best way to draw immediate attention to your product and jump start your business is by offering a contest." Following this advice, "The Shelf's" -- gorilla marketing -- strategy consist of hosting not one but two mystique mystery contest with two titles -- knock Knock Whooz There -- and Sweet Prince of the Ghetto. Make no mistake about it, these books -- (SEE ATTACHMENT TWO & THREE) cropped from R/Marvyn's Blood On My Hands/Ghetto Tale Series @ ATTACHMENT ONE, are so well crafted they can stand alone.

Ideally, for the most broad effect both books -- Knock Knock Whooz There and Sweet Prince of the Ghetto -- which by the way are dynamic trilogies -- and contest would be hosted simultaneously and released in three quarters quarterly

of 2020.E.G., Book Two of Knock Knock Whooz There and Book Five of Sweet Prince of the Ghetto are projected to be released January 15th, of 2021. By April 15th, 2020 Book Three of Knock Knock Whooz there and Book Six of Sweet Prince of the Ghetto are projected to be released. And by August 15th, 2021 Book Four of Knock Knock  and Book Seven of Sweet Prince of the Ghetto are projected to be released are expected to be released; concluding both trilogies. The official deadline for the contest will be October 15th, 2021. Notably, these dates are subject to change. However, " The Shelf" will also have a late deadline date which will allow all submissions -- accompanied by late fees -- to be submitted. After which time a date will be set to announce winners of both contests and cashandprizes on " The Shelf's " Website. The contest is tailored to last one year at which time the Series would begin with the release of Book One -- The Holy Ghetto. Notably, you may notice both books appear to start in the middle of number, however please note that they're in order and are consistent with the dynamic Blood On My Hands/Ghetto Tale Series. The objective was to introduce the Series in the most effective way to attract the most swath of readers in the Miami area.

As explained by Conrad, the contest and sequence of release of books is designed to build anticipation, lure readers, and drive droves of traffic to out exclusive website; thus, not only helping to jump start company in the most effective way but also entice browsers into becoming potential customers. Readers will be challenged to solve two mysteries; who is Knock Knock -- **ATTACHMENT TWO**, and who is blackmailing Rory -- **ATTACHMENT THREE**. The contest rules and regulations along with a clue and chat page -- to further enhance hysteria, excitement, or interest -- will be posted on the company's website biweekly for readers to view and discuss via social media. There, customers will learn and see who they can win instant cash and prizes -- $10,000 and/or free one year lease of a customized company GT Bently Coupe -- if they they are the hundredth thousand purchaser of either title.

**THRIVING FOR A VIRAL MOMENT:**

What an exciting time to be a reader. Each book would feature a high-powered social media blist across the airwayss of Miami Radio stations and tv commercials -- which will include robo calls --, posters and flyers across the city.

UNLOCK YOUR SLEUTH SKILLS
ANNOUNCING NIVRAMSBOOKSHELF FIRST ANNUAL 2021 WHODUNNIT
MYSTERY CONTEST/ COMPETE AND WIN $ 10,000 AND/OR
FREE ONE YEAR LEASE OF CUSTOMIZE GT BENTLY COUPE

NOW READING CAN BE MORE THAN FUNDAMENTAL IT CAN BE DOWN RIGHT REWARDING

With this mystery contest at the helm of "The Shelf's " launch, NIVRAMSBOOKSHELF is projected to sell, at least two hundred thousand copies of both books in Miami alone -- at $14.95, grossing approximately $2,990,000.000 in sales, all within the first semester of year 2021. After expenses, which will include the $500,000.00 investment, " The Shelf" project net sales to be somewhere in the neighborhood of $2,511,400.00 (TWO MILLION FIVE HUNDRED ELEVEN THOUSAND FOUR HUNDRED DOLLARS AND ZERO CENTS), more or less. With these kinds of residual/returns -- see more, transparent figures below -- " The Shelf " projects to pay back entire loan with interest by the fiscal part of 2022. As such, our staff pray you decide to invest your dollars in this project and help make our dreams come true.

**AUDIENCE**

"The Shelf's" target audience is primarily the popular and urban hip hop culture phenomenon that has taken the world by storm But both the style, penmanship, and mystique mystery contest are destine to have a spill over effect and appeal to a much broader genre of readers. The mystery contest will also attract readers from professional backgrounds such as lawyers, police officers or even none readers all looking to try their luck in winning either one of the cash and prizes being offered at " The Shelf." Needless, to say, there will be no losers because everyone will walk a away having read a good book. Suffice to say, each book is written in a mysterious prose and depending on the success and demand of the first titles, will determine if additional contest will be hosted in the future. Which brings us to NIVRAMSBOOKSHELF'S long term goals, which is to reach sales up to one million copies [collectively] of The Series, well within a five year window period -- 5 -- semesters -- to end by the year 2025. This is a feat that has never been endeavored, at least not in the context its being pursued today. The only event remotely close was in the eighties with the tv series and million dollar teaser/tag line " Who Shot Jr," which received national recognition. This mystery contest is projected to do the same; that is with the right tools, team and financial backing.

**COMPETITION**

As you know since the introduction of urban books in the early 1990's hundreds of writers and savvy and shrewd entrepreneurs -- seeking to cash in on this new book or genre phenomenon -- began to capitalize on the new genre by opening publishing companies seeking to lure black writers who possess an innate knack to write street lit with mainstream flare. At one point, street lit had even out sold mainstream literature. As of late, movie producers begun cashing in on this phenomenon by making black busting moves, some famously known as Precious, Boya in da Hood, Menace to Society, True to the Game, just to name a few. All of these movies captured the essence of street lit and the reality of

black life in ways never imagined before. Although late, street lit, following the trend of hip hop, became almost like a movement, that til this day continue to grow into a multi billion dollar industy -- creating opportunities -- for aspiring artists/authors like R/Marvyn to cash in on.
Which bring us to the point that despite the success of urban hip hop literature and the demand for southern stories coupled with the emplosion of social media there are no significant book company or authors coming out of Miami. The Shelf will provide a home for upcoming Miami writers.

Or consider the fact, today urban writing has even been produced into several tv series such as Empire, Star, Power, and Snowfall. In fact, it was the Empire Series that inspried R/Marvyn to envision his work (**ATTACHMENT ONE**) as a book series with idea of one day reaching the big screen. With a million books sold " The Shelf" anticipate its Blood On My Hands/Ghetto Tale Series to reach its tv debut by the year 2023, if not sooner. To that end, as mentioned earlier, it is the author's dizzying writing style, mystery contest platform, and series that consists of 17 books that ultimately distinguishes his work from the rest of the herd  increasing its chance of being successful. As far as competition is concern, yes the urban book genre field is egregiously crowded and competitive. R/Marvyn has researched what's been done and what's not been done, what will work and ultimately what will not. That is to say, no one has ventured on the feat being introduced today which is why The Shelf is confident its brand/platform will prevail, thereby adding yet another much need dynamic to the idea of an author writing and selling his/her work.

Here's a modest look or example of how your investment dollars will be dispersed. Please note, said figures only reflect the Miami and surrounding county areas.

**EXPECTED EXPENSES AND APPROXIMATE**
**QUOTE FOR SEMESTER-YEAR**

Dell Computer, Printer and other
office accessories...........................................$2,500.00


Office Space
1st Quarter Only
Optional....................................................$5,000.00


Exclusive Website
Design......................................................$5,000.00


20 ISBN #s....................................................$600.00

20 Bar Codes....................................................$1,000.00

Editing Expenses., For 11
Manuscripts ( subject to change)...............................$6,500.00

Eleven (11) Exclusive
Book Covers....................................................$5,500.00

Social Media Manager
Expenses For three(3)
Quarters.......................................................$5,000.00

PR/Public Relations
Agent Strategist...............................................$5,000.00

Syndicated Radio
Targeted Ads...................................................$5,500.00
BET Targeted Ads..............................................$10,000.00

Flyers/Posters
Banners Etc....................................................$5,000.00

Purchase of 200,000 books
Off Set Printer...............................................$40,000.00

Storage Space for Books........................................$2,000.00

Contest Prize for Books.......................................$20,000.00
Ten Grand Per Winner

Contest Prize Winners
For Two Pre owned
Bently Coupes................................................$200,000.00

Two Company GMC Promotio n
Mobile BillBoard Vehicles
Lease per Year/Vehicle.....................................$600.00/Monthly
                                                            per vehcile

Year/both Vehicles Projected at.............................$144,000.00

Twenty(20) Library Congress Copy
Right Protection(s)............................................$1,000.00

Total Projections:
$463,600.00

**NOTE:** These projections are subject to fluctuate up or down depending bargaining or eliminating prospects

**PROJECTED SALES**
**& PROJECTED LOST(S)**

First Quarter For
Both Titles:
Knock Knock Whooz There &
Sweet Prince of the Ghetto
35,000 x 35,000...................................................$523,250.00
                                                            +        =1,046,500.00
                                                            $523,250.00
**Projected Loss For Quarter**..................................$5,000.00

Totaling..................................................$1,041,500.00

Second Quarter For
Both Tiles:
Knock Knock Whooz There &
Sweet Prince of the Ghetto
35,000 x 35,000...................................................$523,250.00
                                                            +        =1,046,500.00
                                                            $523,250.00

**Projected Loss For Quarter**..................................$5,000.00

Totaling..................................................$1,041,500.00

Third Quarter for
Both Titles:
Knock Knock Whooz There &
Sweet Prince of the Ghetto
30,000 x 30,000...................................................$448,500.00
                                                            +        =897, 000.00
                                                            $448,500.00

**Projected Loss For Quarter**..................................$5,000.00

Totaling....................................................$892,000.00
**GROSS TOTAL**...........................................$2,975,000.00

SUBTRACT EXPECTED EXPENSES
AND APPROXIMATE QUOTE PER SEMESTER-YEAR BY....................$463,600.00

PROJECTED TOTAL FOR SEMESTER-YEAR.............................$2,511,400.00

OVERVIEW:

   The business plan presented above also include tour promotioms, book
signings, and appearances that will be orchestrated by the author --or his
represerter-- PR Agent, high powered social medial campaign blist, and other
events aimed at boosting sales and bring notoriety and exposure to the author
and the company's future projects.However, the projected expenses could not be
adequately estimated at the time of drafting this business plan but is/was
modestly anticipated in the projected loss sectioh above. In other words, the
book tour would be designed to parenthetically concede to the dollar margin(s)
of the desired dollar amount specified within the projected loss or other over
calculated projections.

   Towards that end, renown author R/Marvyn has worked ( and continues to do
so) extremely hard to to write and devise a concrete plan to publish and sale
thousands of copies of his books. Now it's up to his staff,
       , and                 to do their part. We recognized our obligation with
this saying: "almost all writers share an aversion to self-selling but it's
mostly a function of unfair conditioning. That is, they assume they hate
marketing themselves before they even try because other writers have convinced
them one can't be a good writer and a good salesman at the same time." R/Marvyn
and his staff are here to set the record straight. There's another saying: "
when every one works as one team, you tend to fulfill your objectives.

LAUNCHING YOUR OWN COMPANY
FROM SCRATCH

   Needless to say, starting something from scratch takes guts, faith and a
healthy dose of stubborn optimism. Some would argue deciding to launch your own
publishing company requires a touch of masochism, too, and let's not forget
finance; and sometimes lots of it, which is why we're today. Looking at this
rationally. First, this company is not being started from scratch; its starting
with a wealth of talent and product, skill set, and moral support from a good
number of people. It has taken R/Marvyn almost 23 years to write these stories,
which was created under extreme anxiety while serving decades in prison. Now
it's time to see his dream of becoming a successful author come to life. It is
time to see Miami Get on the map. Which is why this business plan requesting
this investment is so important. Because our staff at NIVRAMSBOOKSHELF @ 360
DEGREES are committed to R/Marvyn's mission goals, and aspirations as if they're
are our own!

Hence   ,NIVRAMSBOOKSHELF @ 360 DEGREES has a faithful hip hop audience of which, if engaged effectively, will respond to its new brand in the most rewarding way. In closing, on that note, the year 2020 will not only mark a wonderful year to be a reader but it will set a trend for all writers to follow. Substantial  plots of visionary hood fiction with mainstream appeal and tone illuminates our company's slogan, "WHERE URBAN HIP HOP LITERATURE COMES TO LIFE. "

In all, thanks for your attention in this very important matter and we hope to hear from you in the very near future.

And as a gesture of good faith, "The Shelf" is willing to discuss donating 5% of its net earning--considering they match or exceed the projected revenues--to the investor(s) desire or favorite charity.

_____
                                        President

Date:                          _____
                                        Treasury

_____
                                        Secretary

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 1:95-cr-00751-UU

UNITED STATES OF AMERICA,

VS.

MARVIN GRIFFIN

            Defendant.
_____/

RELEASE PLAN

In its response to the appeals court's order of remand, this Honorable Court has ORDERED the Defendant [DKT # 176] shall file a detailed release plan including where and with whom he will reside, if release, on or about August 25, 2020. Court's Order at pg 2 of 3.

Before the Defendant delve into the plans of his release -- that he has been anticipating even before the First Step Act -- he would like to state something germane to the issue at hand for the record. And that is that he accept full responsibility for his actions that led to him spending over two decades of his productive life in prison. he notes, in law he's learned -- through prudent study -- that "you assume the consequences of your actions of the act is intentional..." is a true and correct statement. the fact of the matter is, the Defendant admits, he lived a tumultuous life style that was bound to end tragically at some point in his life. The most painful lesson is realizing the pain he put his family through and they too suffered by his absence. However, he would like this Honorable Court to know [...] that a funny thing happened to him during the interim of his departure from his community, society, and friends and family -- life if you will -- that not only has impacted and lifted his life but will also do the same to others he come in contact with from this day forward. The moment he enters back into society.

That is to say, if there's any inquisition or question that has to be determined by this Honorable Court whether the "Defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g), before it can determine whether extraordinary and compelling reasons exists," [appeal court's remand @ pg 3][citing U.S.S.G. §

1B1.13], the fact that the Defendant has mentored not only inmates but staff and persuaded or influenced them many of them into making positive life-style changes remove all doubt or at least it should Defendant is a threat or danger to society he seeks to return to. Notably, this Honorable Court has already eluded to making this determination in Document Entry # 162 where it amended the Defendant's judgment to include a recommendation -- that was not honored by the BOP -- that he participate in RDAP. Id. at pg 2 of 2. There the trial court noted: " such a recommendation is in the interest of justice given the proximity of Defendant's release, length of his sentence, and nature of his offense." Surely, the trial court has determined the Defendant is not a threat to anyone or society.

This is especially true because a funny thing happened to the Defendant during the interim of his departure from life and society. Though his scars from his incarceration run deep -- in the pathos of many regrets and hardships -- beleaguered or haunted by thoughts of his troubled pass and transgressions and nostalgia of family and friends -- he was able to ascertain or gain a wealth of perspective about not life, but also human value and self worth.

So, in this release plan its imperative the Defendant would like to take the opportunity to reintroduce himself to this Honorable Court as he plans to do to his communities and family. He would like an opportunity to not only announce his new brand -- NivramsBookshelf @ 360 DEGREES -- Nivram is the Defendant's name spelled backwards -- a book publishing company founded by him in 2008, and has been in good standards with the Division of Corporations since that time. The purpose of forming the publishing company was to use said company as a conduit to publish his own writings that played a vital role in him rehabilitating himself.

As pointed out in Defendant's initial motion to reduce sentence -- pursuant to the First Step Act -- he pointed out he'd written approximately 26 manuscripts -- that include but is not limited to -- 2 motivational books -- i.e., NightMares/A Deep Spiritual Cleansing Towards Good Dreams and Turning Your Faults into Virtues, a running manual -- the Art of Toe Running --revised title -- Biography -- The Making of a Thug--, and children's book the Cat and the Rat.. he's also recently had two book published since his incarceration -- under the pseudonym Robbyn Marvyn -- i.e., knock Knock Whooz There and Sweet Prince of the Ghetto. These titles are currently available on Amazon.com. The Defendant is also in the process of having his website published that will announce his brand once he's released. Notably, this company is being ran by his family.

## NIVRAMSBOOKSHELF
## @ 360 DEGREES

Nivramsbookshelf (aka "The Shelf") @ 360 DEGREES is an independent book publishing company that was founded by the Defendant in 2008. Said Defendant initiated the firm with the idea of publishing his own manuscripts he'd written while incarcerated. This effort along speaks volumes to his commitment to rehabilitate himself and is definitely apart of his release plans. That is, with respect to the question regarding the Defendant being a threat to his community the publishing company undoubtedly will enhance his community and will create job opportunities for many others. For example, the Defendant's family has agreed to release at 3 books a year. To accomplish this goal they would need a team of editors, writers designers, public relations and web marketing experts that are available right in his community. He notes, there's only two things that transcend humanity and that's children and art. He further notes his community will no doubt embrace his return and the many opportunities that will come along with him. This is so because, as of this date, there's no book publishing company within the Miami and Fort Lauderdale radius that will offer people in his community an opportunity like Defendant believes "The Shelf" will. Not to mention the fact, with an expectation of releasing 3 books per year the Defendant would have to travel around the country to do speaking engagements and books signings.

Pointedly, this Honorable Court should review the Defendant's Business plan attached to his motion for waiver marked as **EXH C** to get an idea of the debt of the Defendant's dreams of aspirations. The trial court should also take note of the fact that the Defendant has been diligently trying to introduce his intellectual property -- that as of to date is available and/or being sold on Amazon -- as we speak. He notes, that finally with the court's assistance he will begin to open lucrative doors that has remained locked shut for so many years. But there's an old saying that "limits are made to push you," and that's what incarceration has done for the Defendant. Pushed him...
In fact, limits have also pushed his family, who desperately and anxiously waiting on him to assist him in every way they can, to assure he's successful with reaching his goals to be a successful author and a productive citizen.

## FAMILY
Speaking of family, as this Honorable Court is well aware the Defendant was married in 2000 -- while incarcerated -- to a young lady name Reba Jackson, who by the way -- along with his family -- has miraculously been a strong and reliable support system throughout his incarceration.

The Defendant will talk more about his wife and family in the latter part of this release plan. Right now he's working with time and work restraints by the prison and needs to get through with this response if he intends to meet the court's August 25th, 2020 deadline.

Towards that end, the Defendant would like to make one other point and that's the fact that he would remiss of his duty -- in this release plan -- if didn't mention how he was able to take care of himself during the time of his incarceration and how his health also factor into his release plans. In otherwords, the Defendant maintains he's in the best physical and mental shape he's ever been in in his life. Despite the toll on his life by incarceration and father time -- that consist of some severe balding and greying -- he religiously run 5 miles a day -- 5 days a week. On Mondays he rungs 5 consecutive miles backwards, which takes him approximately one hour and 3 minutes. On Sundays -- right before the break of dawn -- he does at least 2,000 consecutive jumping jacks and on Saturdays he fast with include a no talking until the sun sets. He's also been a strict vegan since 2008. And did I mention that the Defendant also is on the verge of speaking two languages i.e., English and Spanish. This was once never before heard of, the role incarceration has played in the Defendant's life.
The significance of mentioning this is to point out that the Defendant -- as part of his release plans -- plan to team with the local police force in Miami -- with intent to help restore the broken relationships that has surface since the George Floyd killing -- and enter as many charity marathons as he can. His release plan also entail conducting motivations speaking engagements around the country to discuss his quasi redemption and how he overcome years of incarceration. In fact, before the First Step Act ever came into existence the Defendant had sent out dozens of letters to colleges and Schools offering to come to speak at the time of his release. The Defendant hired a concierge company called "its Georgous " to help facilitate this idea. For more information of this function you can contact Ms. Nae the president of It's Gorgeous at 323-944-8185. They can also be googled.

The main point the Defendant would like to stress is that he came to realize -- and what he would point out to the youth he speak to -- is that his incarceration experience -- no matter much he or anyone else in family disagreed with it -- was destiny that was put on his life; which proves not only for me but a lot of us, that he lived a vicarious lifestyle up until the time God removed him from the streets or his community. This turned out to be a pivotal turning point in the Defendant's life that this Honorable Court should not take light of. Because this was a point the Defendant began to undergo this rigorous

transition that consisted of renewal of a broken mind set.

Needless to say, today, as broken as the Defendant is -- as a result of all his hardships -- loosing his family --that include his mother -- incarceration has given him     this phenomenal renewed sense of purpose. It is the Defendant's goal to see his incarceration be an example of service and sacrifice for others.

To that end, he notes that he prays this Honorable Court will hive him an opportunity to reclaim his freedom -- that has remained elusive for all these years -- by granting him time served and immediate release effectively release. The Defendant further believes -- due to the time the Defendant's has served and the debt of his release plans -- that the trial Court should go a step further -- in the interest of judicial economy and justice -- during this moment when the country is experiencing u deadly pandemic -- suspend the remainder portion of his supervise release. Which would further hinder the Defendant's release plans, not enhance them.

                    The Following is an excerpt
                    drafted and edited from a speech
                    the Defendant drafted earlier this
                    year that was written for a speaking
                    engagement.

**RELEASE PLAN:**

As such, the requirement that an inmate provide a release plan merely enables the court to better determine whether an inmate might be successful if released early and live within the boundaries of the law. Not having a place to reside and not having employment with a steady source of income are factors that create risk of future criminal conduct rather then living lawfully in society.

As noted above, the Defendant submits that in the year 2,000 -- approximately 3 years after he received 30 years by this Honorable Court and several months after the denial of his direct appeal -- he married the young lady Ms. Reba Jackson. The wedding ceremony took place in a control environment located at Edgefield FCI in South Carolina. Ms. Jackson had to travel at least 12 hours to the institution and did so without putting up any kind of resistance. At the time of the marriage Ms. Jackson mothered -- and still does -- three children, Antonio, Erica, and Antwan.. The Defendant fathered -- and still does today -- a single son name Marvin.

After the marriage both Ms. Jackson and the Defendant became biological and step parents, a role we both accepted with pride. It bears noting the relationship between the Defendant and Ms. Jackson did not form while he was in prison, but existed well before the federal offense the Defendant found himself dealing with for a significant portion of his life. In fact, Ms. Jackson, along with the Defendant's big family -- that has lessened over the years -- attended the Defendant's trial and sentence. She was the young lady who burst out of the court in tears when the government recommended the Defendant receive 40 years. Conversely, this Honorable Court imposed a 30 year term of imprisonment, of which the Defendant has successfully and proudly completed 23 years of come this October 25th, 2020. God's willing. He says proudly because he believes the sentence served one of his duties to God. Recall the destiny thing mentioned earlier.

Moreover, before the Defendant's departuer he and his then fiancee Reba shared a residence -- owned by the Defendant's mother -- who now deceased -- if this Court will recall his mother passed in 2017 -- and he was denied an opportunity to attend the funeral -- located at 7525 NW 11th Avenue, Miami Florida 33150.   If   The Defendant is allowed to go free he will visit his mother's grave site the moment he arrives in Miami. This action is also a vital part of the Defendant's release plan.

Anyway, the Defendant the Defendant plans to return to the residence above that has been maintained by his wife since his departure. Currently, the Defendant's stepdaughter Erica and her daughter Anestahia lives in that residence. Once the Defendant is settled he will request time from this court or probation officer to take his wife on the honey moon he feels she always deserved but never received due to the circumstances the Defendant found himself in. After one year the Defendant plans to -- as apart of his release plans -- seek early termination of his supervise release so that he can -- amongst other things -- begin to work on his marriage that has been idled for too long. But I digressed.

We were saying, the remainder of the Defendant's children -- whom are all adults -- along with his wife -- have discussed in length the Defendant's return and strongly support this initial release plan; not to mention look forward to assisting the Defendant in whatever area needed.

**EMPLOYMENT:**

Once there, the Defendant will actively begin to seek employment, and pursue his aspirations in becoming an author. It should be noted the Defendant has been working in UNICOR for

the last year and is familiar with the SAP program -- college software -- routinely used in most warehouses around the country. Amazon will certainly be an employment of interest for the Defendant being as though friendly with x-inmates looking for steady employment. In addition, it bares noting while the country is currently experiencing a pandemic that has left millions of African Americans unemployed, the sales from the Defendant's book along with the extraordinary financial assistance from his family will not only provide a steady source of income for the Defendant but keep him focused.

It also bares noting that the Defendant's wife and step daughter Erica both are employed by the U.S. Postal Service i.e., POST OFFICE, and has been for over 10 years. In addition, the Defendant's sister Toinett Renfroe -- who lives i the same area or proximity Where the Defendant will reside -- a residence located at 7947 NW 11th Avenue, Miami Florida 33150 -- the Defendant's late mother's home -- is a Corrections Officer of Miami Dade County jail.

**FOOD CLOTHING**
**& TRANSPORTATION**

Food and clothing, and definitely not an issue in the even the Defendant is released. The Defendant's sister Ms. Renfroe, and elder brother Floyd Griffin -- who now lives in Georgia and works for Home Depot -- have saved up some generous savings for the Defendant's return that consists of several thousands of dollars. The Defendant plans to use these funds not only for food and clothing and transportation but also to purchase a billboard and radio advertising to further promote the release of his two novels recently published and currently available on Amazon. It was the Defendant's intentions to submit both books with this release plan he didn't have enough time.
See **EXH. C.** business plan -- for more information about the Defendant's goals -- attached to the Defendant's motion for waiver.

**CONTACT INFORMATION**

The court can contact the Defendant's wife at 786-232-5831 at any time. His sister Ms. Renfroe can be contacted -- even as a back up residence -- at 786-691-5116. And his brother Mr. griffin can be contacted at 229-444-1315.

The Defendant also has two other sister, one of which the Defendant has learned -- despite his family trying to keep the information from him -- is gravely ill i.e., Barbra Price and Michelle Griffin, who now resides in Georgia. Barbra resides in Miami. The Defendant hasn't spoken to his elder sister Barbra

in a while but definitely -- as part of his release plans -- plan to the moment he's released. He can only hope he make to her in time before anything tragic happens. His sister Ms Griffin can be contacted -- also as a back up address -- at 786-817-1129. Her address is:

IN fact, the Defendant had planned to live with his sister Michelle upon release but was discouraged due to the difficulty he would face attempting to change the address from the state upon which he was arrested.

Pointedly, none of these individuals have any criminal history at least of a felon or violent nature. With respect to the Defendant's elder sister Barbra the Defendant wishes to be there for her in her moment of difficulty the way he was not allowed to be with his mother.

**********

Also as part of the Defendant's release plan, he plans on enrolling in night school -- once the country fully opens back up-- to study for his bachelors degree in political science and criminal justice.

**RELEASE FROM PRISON**

The Defendant notes his wife is ready and willing to come pick him up from prison and assure that he self quarantine. However, if an effective date of release has been established by this court his wife would like time to plan to take the 15 hour trip -- which total 30 hours to and fro -- and take off from her job. Both the appeals and district court orders caught the Defendant and his family by surprise. No one was expecting them are prepared of the possibility the Defendant could be released as early as August 25th, 2020.

And again, the Defendant notes that the release plan is a procedure employed to make good-faith determinations. While in its discretion the trial court may delete objectionable portions of the release plan or add others if it so chooses to do so the procedure should not be implemented in a way that hinders the Defendant's goals. That is to say, in the interest of justice, this Honorable Court has several determinations to make with respect to the Defendant's release plans and goals. He notes, he's provided her with a detailed release plan as requested and several residences to consider -- if she so chooses -- the Defendant can be released to. He notes, he's not immune from the power of suggestion. He simply maintains this presumptive release date he anticipates receiving is conditioned upon the Defendant's Rehabilitation and not the personal interest of the opposing party.

If the Defendant is successful at the goals he sat to achieve he would have fulfilled his obligation to this Honorable Court and ultimately to himself and family as well as his community. In this sense, there exists an inescapable irony that cannot be ignored in this case. And that is the fact that at the time of the Defendant's arrest he was merely 31 years old. In the fleeting years he's turned a staggering 54. His wife is now 60 years old. The Defendant prays this Court sees the dilemma. This harsh reality descry the fact his time left on this earth is short. And thus it is clear the instant matter is urgent to the Defendant who -- by the way -- has his work cut out for him adjusting back to society moreless contemplating being an author.

**FORGING A NEW BEGINNING**

To that end, the Defendant notes the trial court should choose a plan that will assist the Defendant with forging a new beginning, in the interest of justice. If terminating the remainder of supervise release factor into that determination, then it certainly would make a world of difference in the Defendant's release plans.

Respectfully submitted

------------------------------
MARVIN GRIFFIN 57836-004
YAZOO FEDERAL PRISON COMPLEX
PRISON CAMP
PO BOX 5000
Yazoo City, Ms. 39194

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the forgoing was mailed via First Class Postage to AUSA Arianna Fajardo Orshan Attorney for Appellee located at 99 NE 4th Street, Miami Florida, 33132-2111 on this 19th day of August 2020.

Respectfully submitted

------------------------------
MARVIN GRIFFIN 57836-004
YAZOO FEDERAL PRISON COMPLEX
PRISON CAMP
PO BOX 5000
Yazoo City, MS. 39194

MARVIN GRIFFIN 57836-004
YAZOO FEDERAL PRISON COMPLEX
PRISON CAMP
PO BOX 5,000
Yazoo City, MS. 39194

LEGAL MAIL

CERTIFIED MAIL

7016 0910 0000 9038 4446

UNITED STATES DISTRICT COURT
OFFICE OF THE CLERK
400 NORTH MIAMI AVENUE
MIAMI, FLORIDA 33128 (61

USMS INSPECTED
BY





FOREVER / USA
FOREVER / USA
FOREVER / USA
FOREVER / USA
FOREVER / USA